***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has shown good grounds to reconsider the evidence, and having reviewed the competent evidence of record, the Full Commission hereby modifies the Opinion and Award of the Deputy Commissioner as noted below.
The Full Commission finds as facts and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. That all parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between the defendant-employer and the plaintiff at all relevant times herein.
3. Atlantic Mutual Insurance provided defendant-employer with workers' compensation coverage at all relevant times herein.
4. On May 4, 1999, plaintiff sustained injury to her right ankle, foot and leg as a result of being involved in an automobile accident while in the course and scope of her employment with defendant-employer.
5. Liability was accepted by the defendants by a Form 21 agreement. It was approved by the Industrial Commission on December 13, 1999. TTD benefits were paid based on an average weekly wage of $538.40.
6. The parties agree that plaintiff is currently disabled due to her compensable worker's compensation injuries and is entitled to temporary total disability benefits.
7. Plaintiff contends that as a result of her altered gait from foot and leg casts, crutches and canes, she has developed back pain and requires treatment. Defendant-employer contends that the back condition pre-existed or is unrelated to the injury of May 4, 1999.
8. Plaintiff has returned to work for Defendant-employer in light duty positions on various occasions. Defendants have provided temporary partial disability benefits to Plaintiff based on an average weekly wage of $538.40 for the periods of time she worked light duty for Defendant-employer.
9. The parties agree that plaintiff made a Motion for Approval of additional medical treatment for her back condition on March 6, 2001. Defendants responded to the Motion and on April 10, 2001, Special Deputy Commissioner Cammerano denied the Motion.
10. The issues to be determined before the Deputy Commissioner were:
 a. What is Plaintiff-Employee's correct average weekly wage and what, if any, additional benefit is she owed?
 b. Whether Plaintiff's fibromyalgia was aggravated by her compensable injuries and is she entitled to medical benefits for treatment for her fibromyalgia?
 ***********
The Pre-Trial Agreement along with its attachments and any stipulations that have been submitted by the parties are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based on the competent evidence of record, the Full Commission enters the following
 FINDINGS OF FACTS
1. Plaintiff began working for Griffin Services on March 15, 1999. In this position, she was to be paid a salary of $28,000.00 per year and commissions calculated as 3% on gross sales. Ms. Gordon was advised in her discussions with other Griffin employees that she should expect to earn $40,000.00 to $60,000.00 per year. Plaintiff testified that she expected in her first year she would be able to earn $40,000.00 in income.
2. Plaintiff had only been on her job for two months before she was injured in a work place accident. Ms. Gordon was required by the Employer to complete a time period of training. Due to her previous experience as a sales representative, she was allowed to make client contact earlier than other trainees. She had made sales prior to her accident, but those sales were not yet reflected in her earnings.
3. Defendants admitted that a first year account representative should be able to earn between $5,000.00 to $6,000.00 per year in commissions, in addition to the $28,000.00 in base earnings. By their own admission, first year account representatives could earn $33,000.00.
4. Plaintiff was injured on May 4, 1999, when she was traveling to call on a potential customer and a car traveling in the opposite direction struck her vehicle head on, wherein she sustained serious and multiple ankle fractures. As a result of her injuries, plaintiff was required to use various casts, braces, and boots from the date of her injury to the date of the hearing. She had open reduction internal fixation of her ankle fractures on the day of the accident and subsequently has had two other surgeries to remove the screws and remove scar tissue from tendons. The ankle injuries significantly altered her gait.
6. Dr. Eric Laxer performed plaintiff's emergency surgery and followed up with her treatment. When her ankle did not recover, Dr. Laxer referred her to Dr. Gilbert, at the same clinic. Dr. Laxer and Dr. Gilbert both moved from the Nalle Clinic to Charlotte Orthopedic Specialist and Dr. Gilbert continued his treatment of plaintiff's ankle.
7. Plaintiff started to have back pain after her second surgery. Dr. Gilbert referred plaintiff back to Dr. Laxer for assessment of her back pain. Dr. Laxer related her back pain to her abnormal gait and use of assistive devices. Dr. Laxer issued a letter of March 3, 2000, "Melanie Gordon is a patient in my practice who sustained a right ankle fracture dislocation and had surgery in May of 1999. Since that time she has either been on crutches or using a cane and has developed difficulties with back pain which I relate to not walking normally during this time."
8. Plaintiff required and was refused additional treatment for her accepted ankle injuries. Dr. Gilbert made a referral to Dr. Sebold for a second opinion about an ankle fusion in January 2001. After calling the adjuster for a month, Dr. Gilbert's office advised plaintiff that she would have to involve her attorney to obtain authorization for additional care for her ankle. Plaintiff paid out of her own pocket to see Dr. Sebold for evaluation. Dr. Sebold recommended that plaintiff obtain an AFO, Ankle-Foot Orthosis, to limit the flexibility of her ankle in an attempt to reduce pain. If the AFO does not adequately relieve her pain, plaintiff will require an ankle fusion in the future.
9. Dr. Sebold confirmed Dr. Laxer's findings that plaintiff had an abnormal gait due to her ankle injury. Dr. Sebold also indicated that the degenerative changes that plaintiff has experienced in her ankle joint from the injury would be painful and the pain would also affect her gait.
10. Prior to her automobile accident, plaintiff had been diagnosed with fibromyalgia. Her condition was under control and she rarely missed time from work due to fibromyalgia symptoms. After the severe ankle fracture, with plaintiff's additional surgeries and restrictions concerning activity level, she had an aggravation of her fibromyalgia. As a result of this aggravation and acceleration, plaintiff has had increased fibromyalgia symptoms which influence her ability to return to work.
 ***********
Based on the foregoing Findings of Facts, the undersigned makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage should be calculated based on her anticipated earnings of $33,000.00 per year. Plaintiff did not work 52 weeks immediately preceding her injury; thus, the first and second methods of computation under Section 97-2(5) are not applicable to this case. Plaintiff was paid at a base rate of $28,000 per year; however, determination of her average weekly wage based on the sums actually paid to her would not be fair and reasonable to both parties as contemplated by the third method for determining average weekly wage, because it ignores the term of plaintiff's employment contract that she was to earn a 3% commission and the evidence that plaintiff was already soliciting sales with potential commissions. Evidence was presented as to what the typical employee would make in their first year; however, the wages for an actual employee was not provided as contemplated under the fourth method. Therefore, the Commission chooses to compute average weekly wage under the fifth method based on evidence of what a person of the same class as plaintiff would earn, which according to defendant-employer would be $33,000 per year. G.S. § 97-2(5). Plaintiff's average weekly wage at the time of her compensable injury by accident was $634.62 per week, yielding a compensation rate of $423.08 per week.
2. Plaintiff suffered an aggravation or acceleration of a pre-existing non-disabling condition, fibromyalgia, as a result of her compensable work place injuries and physical limitations caused by her injuries.
3. At the time of the Deputy Commissioner hearing plaintiff continued to be totally disabled as a result of her workplace injuries and had not reached maximum medical improvement. Weekly indemnity benefits shall continue in accordance with the Act, agreement of the parties, or until further order of the Commission.
4. Plaintiff timely and properly requested approval of treatment from Dr. Gilbert, Dr. Laxer and Dr. Sebold. These doctors provided reasonable and necessary care to effect a cure or provide relief. N.C.G.S. §97-25.
 ***********
Based upon the foregoing Findings of Fact and Conclusion of Law, the Full Commission enters the following:
 AWARD
1. Plaintiff's correct compensation rate is $423.08 per week. The Defendants shall continue to pay plaintiff total disability benefits at the rate of $423.08 per week in accordance with the Act or until further order of the Commission, and shall pay the difference between this sum and the amount paid for the past accrued benefits.
2. Dr. Laxer, Dr. Gilbert and Dr. Sebold are approved physicians. The Defendants shall pay all past and future medical expenses for Dr. Laxer, Dr. Gilbert and Dr. Sebold's care when the same have been submitted and approved by the Commission. Defendants shall reimburse Plaintiff for prescription and mileage expenses.
3. Defendants shall pay for all medical expenses incurred or to be incurred by plaintiff as a result of the compensable injury when bills for same have been submitted to and approved by the Industrial Commission, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
4. A reasonable attorney fee in the amount of 25 percent of the compensation approved and awarded for plaintiff is approved and allowed for plaintiff's counsel. The attorney's fee shall be deducted from the compensation awarded to plaintiff and paid directly to plaintiff's attorney. Every fourth check shall be paid to counsel for plaintiff.
5. Defendants shall pay the costs of this action.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER